**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **TERRALL JOHNSON, JR.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | Case No. 08-CV-764-TLW |
| ) | |
| **MICHAEL J. ASTRUE, Commissioner of the** ) | |
| **Social Security Administration,** ) | |
| ) | |
| **Defendant.** ) | |

**OPINION AND ORDER**

Claimant, Terrall Johnson, Jr. ("Johnson"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying Johnson's application for disability benefits under the Social Security Act. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Johnson appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Johnson was not disabled. For the reasons discussed below, the Court, albeit reluctantly, **REVERSES AND REMANDS** the Commissioner's decision.

**Claimant's Background**

At the time of the hearing before the ALJ on June 21, 2007, Johnson was 48 years old. (R. 27). He had an eleventh grade education and had taken some welding classes. (R. 28). He last worked on March 3, 2006 at a convenience store owned by his father. (R. 28-29). He did management work and some work at the cash register. *Id.* He testified that he could not do that

1

work and he had not returned to work since that time due to his heart and back conditions. (R. 29).

Johnson testified regarding back surgery he had several years before the hearing and the pain he experienced in his back at the time of the hearing. (R. 30). He said the pain was middle to lower in his back, and he described it as an extreme pressure type pain that sometimes spiked up. *Id.* He said it sometimes went down his right buttocks and almost always went down his left leg. *Id.* He testified that he had a long 25-year history with back pain, including chiropractic treatment. *Id.* The weather could increase his pain, as could lifting or too much activity. (R. 42-43).

Johnson testified that he had a heart condition that caused fatigue. (R. 31, 44-45). He had a heart attack approximately three years before the hearing. (R. 31). He experienced chest pain daily, and he sometimes used nitroglycerin to help the pain. (R. 45). His primary care physician, Dr. Lewis, treated him for his heart condition, including medication. (R. 32). In the past, he had given up smoking for over two years, but he was smoking "a little" at the time of the hearing. *Id.* He testified that he did not have the tests that Dr. Lewis wanted because he did not have the money for them. (R. 46-47).

Johnson testified that he was prescribed Toprol to treat his high blood pressure, and it had side effects of drowsiness, dizziness, and fatigue. (R. 32). He slept on and off during the night and the day, but he attempted to be awake in the afternoon and evening because his wife was home in the evening. (R. 32-34). He estimated that he spent 75% to 80% of his day lying down. (R. 41). On occasion, Johnson did a load of laundry or a load of dishes, and he swept. (R. 35). He did not do these activities on a daily basis. (R. 43). He shopped and left his house to visit family and friends. (R. 36). He mowed his small yard with a self-propelled mower. *Id.*

Johnson could sit for approximately 20 minutes and stand for about 15 minutes before needing to change positions. (R. 37). He could walk for about 20 minutes. *Id.* Out of an 8-hour

day, he estimated that he could sit for about 40 minutes, stand for about 30 minutes, and walk for about 30 minutes. (R. 37-38). He could comfortably lift 5 pounds, he could stand and bend his knees, but not his toes, and he could usually squat and stand back up. (R. 38). He could pick up items from the floor that weighed less than 5 pounds, and he could climb stairs. (R. 39). He could not do pushing and pulling activities from a seated position because they would hurt his back, but he could pick up small items. *Id.* He was able to drive and operate foot controls, and he could reach his arms overhead, in front of him, and to his side. *Id.* He estimated his right-hand grip as a "3" on a scale of 1 to 5, and his left hand grip as a "2." (R. 40). At the hearing, he used a cane, but it was not prescribed by Dr. Lewis. (R. 47-48).

Johnson testified that he had been a patient of Dr. Brown's, but had been dismissed by him because he had not seen specialists and had not had tests done that Dr. Brown wanted. (R. 50).

An MRI of Johnson's lumbar spine on November 7, 2002 showed a herniated disc at L5-S1 with some foraminal stenosis. (R. 304). Johnson was referred to Dr. Solano for treatment at The Orthopaedic Center. (R. 309-26). At a November 12, 2002, appointment with Steven C. Anagnost, M.D., Johnson rated his pain as a "10" without medication and said that he experienced an injury two years before when he picked up a bale of peat moss. (R. 326). He said that the pain was worse with standing or lifting. *Id.* On physical examination, he had extreme pain upon extension of his back. (R. 321). Dr. Anagnost prescribed therapy and said that if his condition worsened, Johnson might be a good candidate for a minimally invasion technique of microscopic decompression. *Id.* Dr. Anagnost expressed concerns about the high levels of pain medications taken by Johnson and his accustomed use of them. *Id.* Records show that Johnson attended physical therapy in November and December 2002. (R. 305-08).

After physical therapy, Johnson returned to Dr. Anagnost on December 26, 2002, and on

examination had some residual numbness in his feet and positive straight leg raising. (R. 317). Dr. Anagnost's impression was worsening radiculopathy from L5-S1 herniated nucleus pulposus. *Id.* Johnson wanted to proceed with the microdiskectomy because he said his quality of life was so poor that he could not continue to function without excessive amounts of pain medications. *Id.* The procedure was performed on February 3, 2003. (R. 313-14)

At a post-operative appointment with Dr. Anagnost on February 18, 2003, Johnson immediately demanded pain medications, including Valium, OxyContin, and Lortab. (R. 310-11). Dr. Anagnost described him as "very belligerent." (R. 310). On examination, Johnson was able to lean forward and touch his toes and to extend posteriorly 30 degrees. *Id.* He had some diffuse tenderness to his paraspinal muscles. *Id.* Dr. Anagnost's impressions were improved neurologic status after the procedure, and "[c]ontinued narcotics dependence." *Id.* Dr. Anagnost reviewed the need to comply with post-operative therapy and reduce his narcotic use, but Johnson did not want to go to physical therapy and wanted Valium, Soma, and OxyContin, along with increased dosages of Lortab. *Id.* Dr. Anagnost indicated that this was a lengthy discussion, and he gave Johnson only limited prescriptions for Lortab and Soma and advised him that he would not refill narcotic medications. (R. 311).

Johnson saw Jack Brown, M.D. in February 2003, after his back surgery. (R. 254). Johnson complained of back and neck pain of ten years' duration and numbness on his left side since the surgery. *Id.* He also complained of vision problems since the surgery and of insomnia. *Id.* Dr. Brown's diagnoses were low back pain with degenerative disc disease status post microdiscectomy, anxiety, left side numbness, tobacco abuse, and insomnia. Dr. Brown prescribed Lortab, Soma, Methadone, and Valium, and a pain management contract was signed. *Id.* On March 13, 2003, Johnson reported that he had a "little more" pain since returning to work after the back surgery, and

4

his medications were continued. (R. 253). On April 9, 2003, Johnson reported to Dr. Brown that his referred pain was almost all gone, but his back pain was worse, and Dr. Brown continued his medications. (R. 252).

Records from St. John Medical Center show that Johnson was hospitalized from April 26, 2003 to May 1, 2003 for a heart attack and treated with stents placed in arteries. (R. 279-94, 327-49). An interim report indicated that Johnson would need treatment in the future, rather than bypass surgery. (R. 286). The final diagnoses were artherosclerotic heart disease, status post acute myocardial infarction, tobacco abuse, hypercholesterolemia, and chronic low back pain. (R. 327). The discharge medications were Lipitor, aspirin, Plavix for three months, Pepcid, Zyban for one month, and nitroglycerin. (R. 328). He was also prescribed a Nicoderm skin patch. *Id.*

On May 19, 2003, Johnson reported to Dr. Brown that he had a heart attack two weeks before the appointment, and that he had increased pain. (R. 251). Dr. Brown's diagnoses included low back pain, recent myocardial infarction, cardiac artery disease, and fatigue. *Id.* On June 10, 2003, Johnson complained that his pain was not under control, but it appeared that Dr. Brown continued his medications at the previous dosages. (R. 250). Johnson was seen for follow up on July 7, 2003, and September 8, 2003. (R. 248-49).

Beginning January 6, 2004, Dr. Brown's treatment notes were on pre-printed forms titled Pain Management - Progress Note. (R. 247). On that date, Johnson said that he had to cut back on his exercise program, and it was noted that he walked with a limp. *Id.* The diagnoses were low back pain, fatigue, insomnia, and anxiety, and there was a note that Johnson should avoid lifting. *Id.* On March 5, 2004, Johnson complained that his pain was worse. (R. 246). Examination revealed tenderness of his lumbar spine. *Id.* On April 22, 2004, Johnson was advised to attempt to back off of his medications. (R. 245). In June 2004, Johnson reported that he had attempted to cut back on

5

medications but experienced shooting pains. (R. 243). He rated his pain without medications as a "10," and his pain with medications as a "5." *Id.* Examination showed tenderness and spasm of his back. *Id.*

At an August 2004 visit with Dr. Brown, Johnson still rated his pain as a "7-8" without medication, and as a "4-5" with medication, but he said that he felt good. (R. 242). The notes state that he was doing "great" and was walking 2 or 3 times a week. *Id.* In October 2004, Johnson stated that a sharp "ice pick" sensation in his back was worse. (R. 241). There is a note that appears to be advice for Johnson to decrease his activity level. *Id.* After a follow up visit in December 2004, Johnson reported in February 2005 that his pain was up and the attempt to cut back on his medications was not going well. (R. 238-40). After a follow up visit in April 2005, Johnson complained of chest pain in June 2005, and Dr. Brown made a referral to a cardiologist. (R. 235-37). In August 2005, Dr. Brown made a referral to a pain specialist. (R. 234).

Johnson was assessed as a new patient by Russell Moneypenny, D.O. on March 6, 2006, and Dr. Moneypenny reviewed Johnson's history, including his report that he was taking Valium and receiving prescriptions from three different doctors. (R. 273-75). Dr. Moneypenny informed Johnson that he did not do pain management, and he referred him to a pain specialist. *Id.* On examination, Dr. Moneypenny found a moderate amount of tenderness with light palpation in the lumbar area, but he found no significant spasm. (R. 273). He stated that Johnson appeared "to be disappointed in his health and does not appear to want to help himself get better." *Id.* Dr. Moneypenny's assessments were coronary artery disease, hypertension, chronic low back pain, history of peptic ulcer disease, history of migraines, and continued tobacco abuse. *Id.* Dr. Moneypenny gave Johnson samples of new medications, advised him to monitor his blood pressure closely, wanted to see him again in one week, and advised him of the need to help himself get better.

*Id.* He stated that Johnson "primarily just wants to get on disability and be [treated] for his low back pain." *Id.*

Johnson saw Brian Lewis, D.O. as a new patient on March 31, 2006 with a chief complaint of chronic low back pain. (R. 212-15). Examination showed normal gait and range of motion except for decreased range of motion with back flexion and extension. (R. 214). Dr. Lewis' assessments were chronic low back pain, coronary artery disease, insomnia, and essential hypertension, benign. (R. 215). At a May 1, 2006 follow up appointment, it was noted that Johnson was tolerating his medications without side effects, and his compliance was described as good. (R. 207-10). Johnson's blood pressure was at goal. (R. 207). For his heart disease, Dr. Lewis started Lipitor at a low dose to be monitored closely for side effects. *Id.* For mild dyspepsia, Dr. Lewis advised Johnson to take Prilosec over the counter. *Id.* It appears that Dr. Lewis continued Johnson's pain medications while waiting for Johnson's past medical records to be received. *Id.* Dr. Lewis' assessments were essential hypertension, benign, controlled, coronary artery disease, chronic low back pain controlled, and dyspepsia. (R. 209).

On May 26, 2006, Johnson again saw Dr. Lewis and complained of recent chest pains occurring over the previous weeks. (R. 202-06). Dr. Lewis said that Johnson had not followed up with the emergency room or a cardiologist as had been previously recommended. (R. 202). Johnson had discontinued his use of Lisonpril, and aspirin, and he did not start Lipitor or Prilosec as prescribed at the previous appointment, primarily due to fears of dehydration. *Id.* He was only taking nitroglycerin for his cardiac condition, and Dr. Lewis advised Johnson to follow up with a cardiologist or to have tests done, but Johnson declined stating that he wanted to have these tests done when he was able to get on disability. *Id.* Johnson also declined alternative anti-hypertensive therapies that Dr. Lewis discussed with him. *Id.* Johnson repeatedly requested increases in his pain

7

medication, which Dr. Lewis refused, and Dr. Lewis referred to his previous explanation to Johnson that he would be unwilling to do that unless recommended by a pain specialist. *Id.* Johnson agreed to a referral to a pain specialist. *Id.* Dr. Lewis described Johnson's compliance with his hypertension medications as poor, and Johnson's blood pressure was not at goal. *Id.*

At Dr. Lewis' referral, Johnson was evaluated by Venkatesh Movva, M.D. on August 9, 2006. (R. 194-95). Dr. Movva recounted Johnson's history of low back pain, including his nervousness about prednisone injections. (R. 194). Dr. Movva's physical examination showed severe spasms in the paravertebral lumbar region, inability to bend backwards, and apprehension regarding bending backwards or forwards. (R. 195). Johnson had tenderness on lumbar facets bilaterally on each side of his scar from his previous lumbar spine surgery. *Id.* Dr. Movva's diagnostic impressions were status post L5-S1 laminectomy, lumbar paravertebral spasms, and coronary artery disease. *Id.* Dr. Movva discontinued Lortab, added Methadone, and stated that Johnson would be closely monitored for proper usage of the medications. *Id.* Johnson declined to have injections. *Id.*

Dr. Lewis saw Johnson for follow up in September 14, 2006. (R. 359-61). At a November 8, 2006 appointment, Dr. Lewis again discussed medications for his cardiac disease and his hypertension, but Johnson refused to take any prescribed medications for these conditions. (R. 355). While Johnson reported relief from his pain due to an epidural steroid injection by Dr. Movva, he had not obtained any significant amount of exercise. *Id.* At a February 2007 follow up appointment with Dr. Lewis, Johnson again reported "great improvements" in his overall pain symptoms due to the epidural steroid injections from Dr. Movva. (R. 351).

Records indicate that Johnson received epidural steroid injections from Dr. Movva on September 20, 2006, November 15, 2006, January 17, 2007, and April 11, 2007. (R. 365-72).

8

Johnson was examined by agency consultant Jerry D. First, M.D. on August 16, 2006. (R. 183-91). Johnson's complaints were back pain and heart condition. (R. 183). On examination, Dr. First found Johnson's range of motion to be normal except for his lumbar back and hips. (R. 185). Johnson had no difficulty in changing positions from reclining to sitting, and sitting to standing. (R. 186). He was able to walk without assistive devices, and his gait was normal and safe. *Id.* Dr. First's impressions were lumbosacral pain secondary to degenerative joint disease, arthrosclerotic coronary artery disease status post stenting, chest pain atypical for angina, tobacco abuse, and obesity. *Id.*

A Physical Residual Functional Capacity Assessment was completed by non-examining agency consultant Judy Marks-Snelling, D.O. on August 22, 2006. (R. 159-66). She found exertional limitations consistent with medium work. (R. 160). She stated that a cardiologist internist had stated that Johnson's atypical chest pain was not severe or limiting in function.[1] *Id.* She noted Johnson's continued back pain with decreased range of motion, but also noted the normal gait and grip. *Id.* She found that Johnson could only occasionally stoop, but found no other postural limitations. (R. 161). She found no further limitations. (R. 162-66).

A Psychiatric Review Technique form was completed by non-examining agency consultant Cynthia Kampschaefer, Psy. D. on August 22, 2006. (R. 167-80). She found Johnson's anxiety to be non-severe. (R. 167). For the "Paragraph B Criteria,"[2] Dr. Kampschaefer indicated that Johnson

---

[1] The undersigned is unclear as to what report this remark references and is unaware of any such statement by any doctor in the records.

[2] There are broad categories known as the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment. The four categories are (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration. Social Security Ruling ("SSR") 96-8p; 20

had mild restrictions of his activities of daily living, his ability to maintain social functioning, and his ability to maintain concentration, persistence, or pace, with no episodes of decompensation. (R. 177). She found a history of medication for anxiety, but none for depression. (R. 179). She also noted that Johnson's activities of daily living appeared fairly normal. *Id.*

Dr. Lewis completed a one-page form titled "Medical Source Opinion of Residual Functional Capacity" on June 1, 2007. (R. 363). He checked boxes indicating that Johnson could sit for 2-3 hours and stand or walk for 0-1 hours in an 8-hour workday. *Id.* He indicated that Johnson could frequently lift or carry less than 10 pounds, and could only infrequently use his arms for reaching, pushing and pulling. *Id.* He indicated that Johnson had a need to rest due to pain and fatigue, and that Johnson would be absent from work more than three times a month due to his impairments. *Id.* Dr. Lewis wrote in that Johnson had to lie down periodically throughout the day and alternate his positions frequently between sitting and walking. *Id.* For medical findings that supported his assessment, Dr. Lewis referred to Johnson's decreased range of motion of his lumbar and cervical spine. He also stated that Johnson had "frequent issues with severe coronary artery disease which limits his functional capacity." *Id.*

Dr. Movva completed a four-page form titled "Residual Functional Capacity to Do Work Related Activities" on June 22, 2007. (R. 388-91). Dr. Movva indicated that Johnson could sit for a total of three hours a day, stand for a total of 1 hour a day, and walk for a total of 2 hours a day. (R. 388). Johnson could occasionally lift up to 20 pounds and occasionally carry up to 10 pounds. *Id.* Johnson's use of his feet for leg controls was limited, but his use of hands was not. (R. 389). He could not squat, crawl, or climb at all, and could only occasionally bend, reach, handle or finger.

---

C.F.R. Part 404 Subpt P, App. 1 ("Listings") §12.00C. *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

10

*Id.* Johnson was 100% restricted from unprotected heights, moderately restricted from moving machinery and changing temperatures and humidity, mildly restricted from exposure to dust or vibrations, and not restricted in driving. *Id.* Johnson could not work for an 8-hour day, even at a job that complied with all of those restrictions, but Dr. Movva did not fill in any explanation. Johnson's pace of production and concentration were affected, and Dr. Movva's notes are not completely legible but refer to chronic pain. (R. 390). It would be anticipated that Johnson would be distracted from completion of tasks in a timely manner, and again Dr. Movva's explanation is not completely legible but appears to refer to a need for Johnson to lie down frequently. *Id.* Dr. Movva would anticipate that Johnson would be absent about twice a month due to his impairments, and his medications would not interfere in Johnson's ability to concentrate or reason effectively. *Id.* Dr. Movva cited to Johnson's status post lumbar laminectomy, limited range of motion, lack of muscle strength, and muscle spasms as objective medical findings that supported his conclusions regarding Johnson's functionality. (R. 391).

## Procedural History

In March 2006, Johnson filed an application for disability insurance benefits under Title II, 42 U.S.C. § 401 *et seq.* (R. 90-93). Johnson alleged that he was unable to work beginning March 3, 2006. (R. 90). Johnson's application was denied in its entirety initially and on reconsideration. (R. 62-66, 68-70). A hearing before ALJ Charles Headrick was held June 21, 2007 in Tulsa, Oklahoma. (R. 23-58). By decision dated September 11, 2007, the ALJ found that Johnson was not disabled at any time through the date of the decision. (R. 13-20). On October 24, 2008, the Appeals Council denied review of the ALJ's findings. (R. 1-4). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. § 404.981.

**Social Security Law and Standard of Review**

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[3] *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) (detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Williams*, 844 F.2d at 750.

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported

---

[3] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

**Decision of the Administrative Law Judge**

The ALJ found that Johnson met insured status requirements through the date of the ALJ's decision. (R. 15). At Step One, the ALJ found that Johnson had not engaged in any substantial gainful activity since his alleged onset date of March 3, 2006. *Id.* At Step Two, the ALJ found that Johnson had severe impairments of "status post myocardial infarction; coronary artery disease; and status post microdiscectomy at L5-S1." *Id.* The ALJ discussed Johnson's complaints of depression and found that these conditions were mild and would have only minimal effect on Johnson's ability to perform work-related activities. *Id.* At Step Three, the ALJ found that Johnson's impairments did not meet any Listing. (R. 16).

The ALJ determined that Johnson had the RFC to perform the entire range of light work. *Id.* At Step Four, the ALJ found that Johnson could return to his past work as a convenient store manager, operations manager, and security guard. (R. 19). As an alternative finding at Step Five, the ALJ found that there were jobs that a person with Johnson's RFC could perform. *Id.* Therefore, the ALJ found that Johnson was not disabled at any time through the date of his decision. (R. 20).

### Review

Johnson asserts errors relating to the ALJ's hypothetical propounded to the vocational expert, the ALJ's analysis of the treating physician opinion evidence, and the ALJ's credibility assessment. Because the undersigned finds that the ALJ's decision did not adequately explain his rejection of the treating physician opinions and the weight he gave those opinions after he rejected them, the undersigned finds that the ALJ's decision must be reversed and remanded for further consideration.

First, however, the Court finds that the ALJ's credibility assessment was adequate and would have been affirmed, had the issue regarding treating opinion evidence not required reversal. Credibility determinations by the trier of fact are given great deference. *Hamilton v. Secretary of Health & Human Services,* 961 F.2d 1495, 1499 (10th Cir. 1992).

> The ALJ enjoys an institutional advantage in making [credibility determinations]. Not only does an ALJ see far more social security cases than do appellate judges, [the ALJ] is uniquely able to observe the demeanor and gauge the physical abilities of the claimant in a direct and unmediated fashion.

*White v. Barnhart*, 287 F.3d 903, 910 (10th Cir. 2001). In evaluating credibility, an ALJ must give specific reasons that are closely linked to substantial evidence. *See Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995); Social Security Ruling 96-7p, 1996 WL 374186.

> While a claimant's credibility is generally an issue reserved to the ALJ, the issue is reviewable to ensure that the underlying factual findings are "closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings."

*Swanson v. Barnhart*, 190 Fed. Appx. 655, 656 (10th Cir. 2006) (unpublished), *quoting Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005) (further quotations omitted).

Here there is no question that the ALJ gave specific reasons for his credibility assessment that were linked to substantial evidence. The ALJ noted the fact that there was no evidence that Johnson had received any treatment from a cardiologist since his heart attack in 2003. (R. 17). The failure

to seek medical treatment is a legitimate point in a credibility assessment. *Qualls v. Apfel*, 206 F.3d 1368, 1372-73 (10th Cir. 2000).

One of the principal specific reasons for the ALJ's credibility assessment was Johnson's clear record of non-compliance. (R. 17-18). Non-compliance is a legitimate factor to be considered in a credibility assessment. *See, e.g., Romero v. Astrue*, 242 Fed. Appx. 536, 543 (10th Cir. 2007) (unpublished). Dr. Lewis repeatedly noted and discussed in some detail Johnson's refusal to take medication for his heart condition and his hypertension, including his unwillingness to consider alternative therapies. The ALJ also summarized Dr. Moneypenny's written evaluation in which he stated that Johnson did not want to help himself get better, but just wanted to get on disability and be treated for his low back pain. (R. 18, 273).

Another reason cited by the ALJ in his credibility assessment was Johnson's drug-seeking behavior, and the ALJ included references to three different treating physicians who noted troubling behavior by Johnson regarding narcotics. (R. 18). These included Dr. Anagnost's detailed report of his concerns regarding Johnson's demands for narcotics and his refusal to comply with physical therapy requirements, Dr. Moneypenny's recounting of Johnson's statement that he obtained Valium prescriptions from three different physicians, and Dr. Lewis' description of Johnson's repeated requests for increasing his dosages of narcotics. *Id.* These specific references by the ALJ provide substantial evidence supporting his credibility assessment. *Poppa v. Astrue*, 569 F.3d 1167, 1171-72 (10th Cir. 2009).

Given the substantial evidence supporting the ALJ's credibility assessment, the Court's reversal is reluctant. Reversal is required, however, because the ALJ's decision does not adequately explain the specific legitimate reasons that made him reject the opinions of Dr. Lewis and Dr. Movva. If it was not the intention of the ALJ to completely reject those opinions, then the ALJ

failed to explain the weight that he gave them and the specific reasons for the given weight. In finding that the ALJ's analysis of the treating physician opinion evidence was inadequate, the Court is mindful that it cannot usurp the role of the ALJ by creating *post hoc* rationalizations to support the ALJ's decision that are not apparent from the ALJ's decision itself. *Haga v. Asrue*, 482 F.3d 1205, 1207-08 (10th Cir. 2007); *Lopez v. Astrue*, 2010 WL 1172610 (10th Cir.) (unpublished).

A treating physician opinion must be given controlling weight if it is supported by "medically acceptable clinical and laboratory diagnostic techniques," and it is not inconsistent with other substantial evidence in the record. *Hamlin*, 365 F.3d at 1215. *See also* 20 C.F.R. § 404.1527(d)(2). Even if the opinion of a treating physician is not entitled to controlling weight, it is still entitled to deference and must be weighed using the appropriate factors set out in Section 404.1527. *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004). The ALJ is required to give specific reasons for the weight he assigns to a treating physician opinion, and if he rejects the opinion completely, then he must give specific legitimate reasons for that rejection. *Id.* When a treating physician's opinion is inconsistent with other medical evidence, it is the job of the ALJ to examine the other medical reports to see if they outweigh the treating physician's report, not the other way around. *Hamlin*, 365 F.3d at 1215 (quotation omitted).

In discussing the opinion evidence given by Dr. Lewis, the ALJ first referred to the evidence that he had detailed earlier regarding Johnson's non-compliance. (R. 18). The Court agrees that there was substantial and persuasive evidence of Johnson's non-compliance, but the ALJ never explained how a patient's non-compliance undermines a treating physician's opinion evidence. While there may be valid explanations that would constitute a specific reason for rejecting Dr. Lewis' opinion, no explanation is contained in the ALJ's decision, and the undersigned cannot create one *post hoc*. *Haga*, 482 F.3d at 1207-08.

Next in his discussion of the treating physician opinion evidence, the ALJ referred to Dr. Movva's statement that Johnson had "good improvement in functionality" after the epidural steroid injections. (R. 18, 366). This is evidence indeed of improvement, but it is not evidence that is contradictory or in conflict with the functional assessment that Dr. Movva gave. For example, perhaps without the improvement Dr. Movva's assessment would have been much more restrictive. Because Dr. Movva's statement that Johnson had good improvement in functionality does not necessarily conflict with his RFC assessment, this is not a specific legitimate reason for rejecting Dr. Movva's report.

The ALJ next stated that neither doctor mentioned that Johnson was disabled before they completed the forms. (R. 18). Again, this is a true statement, but its tendency to undermine opinion evidence is tenuous at best, because treating physicians do not always include references to disability or to residual functional capacity in their treatment records. Without other specific legitimate reasons, this one statement is not adequate to support rejection of a treating physician opinion.

Finally, the ALJ included a statement of two legitimate reasons, but without any specificity: "[The opinions of Dr. Lewis and Dr. Movva] cannot be given controlling weight because they are in conflict with each doctor's own treatment records and inconsistent with the other substantial evidence as noted above." (R. 19). By itself, this sentence is a boilerplate provision that fails to inform this Court in a meaningful, reviewable way of his reasons for rejecting the physicians' opinions. *Hardman v. Barnhart*, 362 F.3d 676, 679 (10th Cir. 2004) (boilerplate statements "[fail] to inform us in a meaningful, reviewable way of the specific evidence the ALJ considered in determining that [the claimant's] complaints were not credible."). This Court cannot tell what the conflicts were that the ALJ found between the opinions of the treating physicians and their treatment notes. The Court also cannot tell what the "other substantial evidence as noted above" is. The ALJ

was required to link these legitimate reasons for rejecting a treating physician opinion to specific evidence in order to allow this Court to meaningfully review this analysis, and the ALJ here failed to sufficiently explain his reasoning. Thus, the ALJ's decision does not comply with the requirement that he give specific legitimate reasons for rejecting the opinions of Dr. Lewis and Dr. Movva. *Langley*, 373 F.3d at 1119.

Moreover, the Tenth Circuit in a recent unreported decision again reiterated the requirement that an ALJ who rejects a treating physician opinion must nevertheless explain what weight he gave to that opinion. *Lopez*, 2010 WL 1172610, *citing Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003). Here the ALJ was explicit in stating that the opinions of Dr. Lewis and Dr. Movva were not entitled to controlling weight, but he gave no explanation of what weight he did assign to their opinions. (R. 18-19). This failure also requires reversal. *Lopez*, 2010 WL 1172610.

Because the errors of the ALJ in his discussion and analysis of the treating physician opinion evidence requires reversal, the undersigned does not address the remaining contentions of Lewis related to Steps Four and Five. On remand, the Commissioner should assure that any new decision sufficiently addresses those concerns.

## Conclusion

Based upon the foregoing, the Court **REVERSES AND REMANDS** the decision of the Commissioner denying disability benefits to Claimant for further proceedings consistent with this Order.

Dated this 31st day of March, 2010.

_____
T. Lane Wilson
United States Magistrate Judge